IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
_____

UNITED STATES OF AMERICA,  )
                Plaintiff,  ) Case No.
                              ) CV-06-206-E-BLW
vs.  )
                              )
KRISTER "KRIS" SVEN EVERTSON,  )
a.k.a. Chris Ericksson,  )
a.k.a. Krister Ericksson,  )
                Defendant.  )

REPORTER'S TRANSCRIPT EXCERPTS OF PROCEEDINGS

*Opening Statements,*
*Jury Instruction Conference,*
*and Closing Arguments*

Before Chief District Judge B. Lynn Winmill

Held June 11, June 15, and June 18, 2007

Reported by:
Stacy A. Heinz, RPR, CRR, CSR #683

---

APPEARANCES:

For Plaintiff:   RONALD J. TENPAS
                 Acting Assistant Attorney General
                 by J. RONALD SUTCLIFFE
                 Trial Attorney
                 U.S. Department of Justice
                 Environmental Crimes Section
                 c/o U.S. Attorney's Office
                 800 Park Blvd., Ste. 600
                 Boise, ID 83712

                 THOMAS E. MOSS
                 United States Attorney
                 by MICHELLE MALLARD
                 Assistant United States Attorney
                 801 E. Sherman, Room 192
                 Pocatello, Idaho 83201

For Defendant:  FEDERAL DEFENDER SERVICES OF IDAHO
                 by NICOLAS V. VIETH
                 and STEVEN V. RICHERT
                 757 North 7th Ave.
                 Pocatello, Idaho 83201

* * * * *
* * *
*

---

INDEX OF PROCEEDINGS

Opening Statements................................ 4
Jury Instruction Conference....................... 21
Closing Arguments................................. 27

* * * * *
* * *
*

---

                  P R O C E E D I N G S
                      June 11, 2008
                        --oo0oo--
* * * * * BEGINNING OF REQUESTED EXCERPT * * * * *

                   OPENING STATEMENTS

       MS. MALLARD: Ladies and gentlemen, Mr. Evertson, the defendant here moved to Salmon, Idaho, with hopes to make money from a process that he hoped to perfect. He met, while he was in Salmon, a number of friendly and helpful people, many of whom you will get to meet over the course of this trial. One of the people that he met was a young man named Robert Chaffin. He had a family, a young family with children, and he owned Steel and Ranch Supply, a business in Salmon, Idaho, that he had purchased from his father.

       Mr. Evertson did business with the Chaffins when he first came to Salmon. He ordered some custom steel tanks and trailers from them and made some other purchases.

       The Chaffins went out of their way to be helpful to Mr. Evertson. It seemed like, to them, that he needed help with things like adjusting to the weather in Salmon and in using a forklift and in other

ways in the community.

Steel and Ranch Supply was just down the road from Mr. Evertson's manufacturing facility, also called the Tanner Building, and so they frequently had contact with him.

Throughout the Chaffins's relationship with Mr. Evertson, he wouldn't tell them what he was doing there in Salmon, wouldn't tell them about the process. And it almost got to be a game between the two of them trying to find out from Mr. Evertson what he was doing, the Chaffins and Mr. Evertson. The Chaffins would ask, and Mr. Evertson would decline to tell them.

They knew that large truckloads of supplies and materials were being delivered to the Tanner Building, which was right on the main street in Salmon. And they saw the drums and built the tanks, but were never privy to Mr. Tanner's plans for these items. He didn't talk about it with them.

Eventually, Mr. Evertson decided he was going to leave Salmon. His process wasn't working. He didn't want to pay rent on the building anymore. He hadn't been able to accomplish what he set out to do, and so he decided to go back to Alaska.

When he did that, when he made that decision -- he stored lots of stuff in the Tanner

Building. He had drums and tanks and lots of stuff that he did not want to haul back to Alaska.

So he started looking around for a place to leave all of the materials that he had in the Tanner Building, and he asked Robert Chaffin if he could store his stuff at Steel and Ranch Supply. And Robert Chaffin said no, he didn't want the stuff there. Mr. Evertson continued to ask him, and Mr. Chaffin continued to say, "No, I don't want to store it there."

Eventually, though, having some sympathy for Mr. Evertson and wanting to be helpful, the last time Mr. Evertson came to him and said, "I'm leaving right away, I can't find anyplace else to store this stuff, will you please store it for me?" And Mr. Chaffin finally relented and agreed to store Mr. Evertson's materials at his yard at Steel and Ranch Supply without knowing what the items were.

When the day came for Mr. Evertson to move, Mr. Robert Chaffin was surprised to find out not only was he storing the stuff, but that he was moving it for Mr. Evertson. He had not understood that to be part of the deal. But when the day came, they found out that Mr. Evertson had made no plans to haul a considerable amount of heavy material from the Tanner Building down to the Steel and Ranch yard.

And so Mr. Chaffin and his dad picked up the slack and used some trailers to haul the considerable amount of materials from the Tanner Building down to the Steel and Ranch Supply yard.

In exchange for their storage of Mr. Evertson's equipment and materials, they agreed that he would -- that Mr. Evertson would give Mr. Robert Chaffin a super sack size full of industrial borax. This was a material that Mr. Chaffin could sell in Salmon, and they agreed that it would be fair to pay for a year's worth of storage materials for that sack of borax. And so that was their agreement.

On the day that the Chaffins moved Mr. Evertson's materials and equipment, they asked him what was in the drums that they were moving, and he refused to tell them. They moved the stuff down to their yard anyway.

As it turned out, they didn't have the proper equipment to move the materials in these drums either. It was far too heavy. The trailers they had were too small. As they moved the materials from the Tanner Building down to Steel and Ranch Supply farther down the highway, the main street of Salmon, the trailer wheels flattened. They didn't blow. They were worried they might, but they didn't blow, but they did flatten.

And so, consequently, they drove very slowly down the highway. The load was somewhat precarious because they didn't have the proper equipment to move it. And somewhat exacerbated, the Chaffins made their way back and forth between the Tanner Building and the Steel and Ranch Supply and stored Mr. Evertson's materials.

When they got to the Steel and Ranch Supply yard on moving day, Mr. Evertson did take the step of covering up the drums with some tarps and some ropes and told them, "As long as it doesn't get wet, it will be okay. Just don't get it wet." And apparently to keep it from getting wet, he put the tarps over it, over the drums, and covered them with cords.

What happened after that? Nothing. Nothing happened. Mr. Evertson didn't come back in the promised year. He didn't contact the Chaffins. He may have called them once in the first year for a friendly chat, but he didn't inquire about his materials. He didn't make any efforts to go back to Salmon. He didn't tell the Chaffins what his plans were.

Eventually, the tarp degraded, tore apart, left the drums uncovered, and the drums became rusty and corroded. The Chaffins got tired of the stuff in their yard after about -- well, it was over a year and

1  a half from the time that they had taken the stuff down
2  to their yard. They couldn't get ahold of
3  Mr. Evertson. The e-mail addresses he had left them
4  didn't work or he didn't respond to them. They
5  couldn't find his address. They asked his
6  brother-in-law and sister how they could contact
7  Mr. Evertson. They had no idea how to get ahold of
8  him.
9      And so the Chaffins were left with these
10 materials and tanks in their yard that they didn't
11 want. They were ready to get rid of them.
12     As it turns out, the Chaffins did eventually
13 find out what was in the drums and the tanks. They
14 found out from the EPA, not from Mr. Evertson, and what
15 they found out was that the drums contained sodium
16 metal. It's a highly explosive metal when it comes
17 into contact with water. And the tanks, they found
18 out, contained highly reactive sludge that can start on
19 fire, and another tank that contained highly corrosive
20 liquids high in pH. This they found out from the EPA.
21     Mr. Evertson knew what the materials were that
22 were being stored in the drums and in the tanks at the
23 Steel and Ranch Supply yard. He knew the danger
24 associated with those materials, yet he chose not to
25 tell the Chaffins what they had in their yard or the

1  danger resulting from those materials or associated
2  with them.
3      Mr. Evertson, he left Salmon, and he left
4  responsibility behind. He left responsibility for
5  those drums and those tanks with Mr. Chaffin, who had
6  no idea what was in them because Mr. Evertson chose not
7  tell them.
8      The EPA cleaned up the sludge in the tanks and
9  the sodium metal and the drums from the Steel and Ranch
10 yard after a difficult process of finding out what was
11 in those tanks.
12     The government has charged Mr. Evertson with
13 violating the Hazardous Materials Transportation Act.
14 We allege that he caused the Chaffins to move those
15 hazardous materials, and that he did it without filling
16 out any shipping papers, without filling out or
17 placarding the trailers or labeling the drums. They
18 moved that blind, not knowing what they were moving
19 from the Tanner Building down to the Steel and Ranch
20 Supply house.
21     We allege that Mr. Evertson did this even
22 though he knew regulations governed the moving of
23 hazardous materials, including sodium metals and
24 corrosive liquids and the sludge. That is Count 1.
25 Count 1 is a violation of the Hazardous Materials

1  Transportation Act, and we claim that he violated that
2  act when he didn't put the appropriate notice of those
3  dangerous materials on both the shipping documents or
4  on the trailer that moved them. And certainly he
5  didn't notify the Chaffins of what they were moving.
6      In the second and third counts, the government
7  alleges that Mr. Evertson violated the Resource and
8  Conservation Recovery Act, or RCRA. We allege that he
9  stored reactive and corrosive materials -- reactive and
10 corrosive hazardous waste in two different forms, and
11 he did it without a permit.
12     He did it by moving the tanks and storing them
13 at the Steel and Ranch Supply -- the above-ground
14 storage tanks are one count -- and that he also did it
15 by abandoning the sodium metal in the drums at the
16 Steel and Ranch Supply yard. The waste was the sodium
17 metal that had been abandoned and the processes or the
18 sludge from the processes that were still in the
19 above-ground storage tanks.
20     So what we claim he did was store reactive and
21 corrosive materials without a permit at the Steel and
22 Ranch Supply house.
23     In addition to hearing from Robert Chaffin,
24 you'll hear from a number of other people from Salmon
25 who were helpful to Mr. Evertson in a variety of ways.

1      Tim Sundles is Mr. Evertson's brother-in-law.
2  He is the one whose mother loaned Mr. Evertson a
3  significant amount of money to fund Mr. Evertson's
4  hopes of creating this process that would be
5  commercially viable. Mr. Sundles, his wife Diana, and
6  Mr. Evertson all formed a corporation, and they hoped
7  that they would be able to create a process that would
8  make them some money eventually. Mr. Sundles will tell
9  you how Mr. Evertson changed the locks to the Tanner
10 Building and wouldn't let him in after a certain period
11 of time and how eventually the corporation that they
12 formed died.
13     Diana Sundles is Mr. Evertson's sister, and
14 she will testify as to how he told her that he couldn't
15 get the job done and that he was unsuccessful in
16 converting sodium metal to sodium borohydride. She
17 will also testify as to how the Chaffins contacted her
18 a number of times trying to find out Mr. Evertson's
19 contact information.
20     Jeanine Tanner was the owner of the Tanner
21 Building at the time that she rented it to
22 Mr. Evertson, and she will testify that she both rented
23 the building to the SBH Corporation and that she
24 required them to get insurance because of the dangerous
25 nature of the processes they were undertaking in that

## Page 13

building on the main street in Salmon.

Frank Dalrymple will testify about the two trailer loads of sodium metal that he delivered from the Tanner Building to Mr. Evertson, and that he delivered those two truckloads of sodium metal with all of the appropriate shipping documents that notated that it was hazardous materials and dangerous when wet, with all of the proper labeling placarding and shipping documents, and that he got Mr. Evertson's signatures on those documents that clearly identify the materials as hazardous. Mr. Evertson signed his name Kris Ericksson, which is a name he went by while he was in Salmon.

Grant Havemann and Bob Perry were also people in Salmon who had contact with Mr. Evertson, and they will tell you about their contacts with him. Besides the residents of Salmon who will testify, an FBI agent will tell you that Mr. Evertson had told him that he had run out of money and couldn't make the process work.

You will hear from an EPA on-scene coordinator -- his name is Marc Callaghan -- who helped with the cleanup response at Steel and Ranch.

You will hear from Terry Gregory, who will testify that no permits were issued to store materials

## Page 14

at Steel and Ranch Supply, that Mr. Evertson never applied for or obtained a permit to store waste at the Steel and Ranch Supply building.

Jeff Fowlow, Carl Overpeck, and Tom Boyden will all testify as to the sampling, cleanup, and testing of the materials that were found at Steel and Ranch Supply.

Richard Ross will detail the chemical analysis of the waste and show just how reactive it was.

Tom Wright of the Idaho State Police will tell us about the DOT regulations and why we have laws governing the storage of hazardous materials.

We anticipate that the defendant will claim the waste wasn't really waste, and he will point the finger at a lot of other people and claim that he didn't do anything wrong.

What we ask you to do is to carefully evaluate the evidence that you hear, listen carefully to the law as the judge will read it to you at the close of the case, evaluate that using the common sense that you have all obtained in the course of your lifetime, and measure that against Mr. Evertson's actions. And when you do, we ask that you return a verdict of guilty against Mr. Evertson for slighting the Hazardous Materials Transportation Act and the Resource and

## Page 15

Conservation Recovery Act.

Thank you.

THE COURT: Thank you, Ms. Mallard.

Mr. Vieth.

MR. VIETH: There are two issues with this case. The government has to prove that Mr. Evertson willfully violated the rules and regulations as to the Department of Transportation. They have to show you that. Willful. Knew it. Broke it. The second one was abandoned it. Threw it away. Done with it. Discarded it. Abandoned it.

Well, looking back over time, and you'll see it through the witnesses, their statements, and you will see it through the exhibits, this is about NaBH4 -- that's sodium borohydride -- and Mr. Evertson's plan to perfect the process that would enable his company to be able to more effectively manufacture that product. Sodium borohydride. NaBH4.

Now, this is a valuable commodity. It's used in a variety of different applications: Recycling paper, pharmaceuticals, and, hopefully, in the future for hydrogen cells, hydrogen cars.

Mr. Evertson wanted to develop a more effective way to produce this, so he studied the patents; countless hours. And you'll see this in the

## Page 16

notebooks. You will see this in the things that we'll bring before you, that Mr. Evertson spent countless hours looking at the patents, looking at the chemistry, trying to figure out a different way, a more cost effective way to make sodium borohydride. He did it. And we'll show you testimony from an expert that has looked over this process, his process. It worked.

So Mr. Evertson approached his brother-in-law, Tim Sundles. What do you think? Can we do it?

Mr. Sundles was convinced. He went to his mother. $100,000 in the bank. Got the corporation papers out of Nevada. SBH Corp was born. The purpose: To make sodium borohydride. SBH Corp.

With this process, they were hoping to make money. With that $100,000, Mr. Evertson, through SBH Corp and the money that was provided, started buying the items that made it necessary to make NaBH4, sodium borohydride, through this new process.

You will see that he bought sodium metal, elemental sodium, from the Chinese. Ten metric tons shipped over, brought down from Kent, Washington, down to Idaho Falls and then up to Salmon.

You will also see that he purchased a bunch of other things. Borax. You will see that he bought equipment that he needed to make sodium borohydride.

He bought big drums, mixers, valves, all the different things that he needed to get to the end result, sodium borohydride.

So in approximately 2000 to approximately 2002, in Salmon, Idaho, Mr. Evertson hunkered down and worked on this all hours of the day. This was his dream. He didn't take pay. He wanted to make it work. And you'll see how much time and energy went into this with the hope of securing a patent and making it.

At the end of two years, everything's hooked up. Everything's ready to go. He starts the process, mixing it. Everything's a go. He heats it up with propane. You have to heat it up to 450 degrees Celsius, mix it up and make it. That's 842 degrees Fahrenheit. Really hot. Big drums.

He gets it up to 612 degrees, runs out of propane. It takes a lot of propane to heat a big tank. Didn't get it there. It started cooling down. No more propane. Stop mixing. Out of money. He tells Tim, "I've got to keep this going. I have to go back up to Salmon to make some more money." He tells Mr. Chaffin, "I have got to go up to Salmon. I gotta make some more money."

So we have to put the stuff in storage. He has to put all the tanks, all of the equipment, all of

the raw sodium metal in the drums, the borax, big huge sacks, everything has got to go into storage.

So he calls up his friend, Robert Chaffin. He calls up Robert and asks Robert, and Robert agrees because Robert has been working with Kris. He has been working with Kris, going over there, helping him with different projects, steel projects, making trailers. He owns Steel and Ranch.

SBH Corp and Kris have been giving him a lot of business. He helps him out. He employs his dad. His dad comes over with Robert. Both the Chaffins have had, at one time, CDL's. Clyde has a hazardous waste endorsement, hazardous materials. He's moved hazardous materials before.

Come over. They move it a half a mile down the road down to Steel and Ranch, point A to point B. Raw material and the equipment. Put it in storage. Tarps over it. Tarps over the borax. If rain hits the borax, the borax turns to concrete. Shuts off the valves. On all the trailers that all the equipment's on, put metal bars under the trailers to lift the weight off of the axles, putting stuff in storage so it can be used again.

So after this happens, Kris goes up to Alaska. Working. EPA investigates.

Now, EPA believes that this is a bad deal. They say the deal was broken between him and Robert Chaffin. You'll see that the deal was for 1000 pounds per year. That was the deal. You'll hear from Tim, "Yeah, he's coming back down."

And you will be able to look through the evidence and you will be able to see the pictures of how this was stored, how much this material was worth, how much he spent on this, not only just money, but the time and the energy and the passion and the dream. And you'll see that. You'll see that right before you.

Now, the government will make you believe that he doesn't want to talk to anybody or he wants to hide things. Well, you will also hear that getting a patent isn't the easiest thing to do and it's expensive. And that what people do in this business, is develop it, figure out how to do it, and then approach the big guys and then go to the Duponts of the world and hopefully make their million.

So you'll hear that from this expert.

And you'll also hear how Mr. Evertson has a stutter and doesn't like to talk. You'll also hear how Kris doesn't like to be real social. He's not a person that just goes out. He's more of a hermit. He likes to keep to himself.

He's smart. He knows chemistry. But remember, the government has to show that he also knows the rules of transportation, that he knows the federal rules and regulations as to the Department of Transportation for the transport of hazardous waste and hazardous materials.

So it will be up to you whether or not he knew those rules and whether or not he abandoned, threw away what was his life.

THE COURT: Thank you, Mr. Vieth.

* * * * * END OF REQUESTED EXCERPT * * * * *

P R O C E E D I N G S
June 15, 2007
--oo0oo--
* * * * * BEGINNING OF REQUESTED EXCERPT * * * *

### JURY INSTRUCTION CONFERENCE

THE COURT: Let me indicate for the record that we are convening court for the purpose of an on-the-record instruction conference. The Court has previously provided counsel with a set of instructions. We've gone back and forth on a number of items. I have made modifications to account for certain requests from counsel. Other requests and objections I have not included in this final set of proposed instructions to the jury.

Counsel, I would remind you that if you stated an objection or made a request of the Court which I did not exceed to, that you need to state that for the record so that you can preserve your record on appeal because our informal conference was not on the record.

So let me start with the government. What objections do you have to the Court's proposed charge to the jury that's Instructions Nos. 1 through 23?

MR. SUTCLIFFE: I have to look them over and make sure that they conform to what we agreed.

THE COURT: Counsel, do you want me to give you ten minutes to --

MR. SUTCLIFFE: I just got them. I didn't have a chance to read them.

THE COURT: Oh, I'm sorry. I guess I can assure you that they do.

MR. VIETH: With the assurances it will be fine.

THE COURT: Let's take ten or 15 minutes. Just go through them, make sure we get it right. As soon as you have a chance to go through them, we will go on the record.

MR. VIETH: There were only few, weren't there?

THE COURT: There were. We will just wait a few minutes.

(Whereupon, the Court recessed.)

THE COURT: Okay. Now back on the record. Okay. From the government?

MR. SUTCLIFFE: We have no objection, Your Honor.

THE COURT: No objections to the instructions?

MR. SUTCLIFFE: No.

THE COURT: From the defense?

MR. VIETH: Just one objection, and that was

contained, I think, in Instruction 11. And we would just request an instruction more on the following of *Cheek* and I think it's *Bryan* regarding Element 2, that the defendant had --

THE COURT: Element 3, I believe.

MR. VIETH: What was that? Excuse me, Your Honor?

THE COURT: I think it's Element 3 that the defendant had knowledge that his conduct was unlawful.

MR. VIETH: We would actually move it up to Count 2, that the defendant willfully failed to placard and provide the shipping papers as required by the regulations, and the defendant had knowledge that his conduct was unlawful.

THE COURT: Oh, wait. I'm sorry. I don't know that I understood your objection that we discussed informally in that light. Would you explain it one more time?

MR. VIETH: We have no --

THE COURT: I need to know exactly what you want it to say.

MR. VIETH: Yes, Your Honor. As to Element 1, we have no issue.

As to Element 2, it currently reads that the defendant had knowledge of the facts giving rise to the

violation. We would request that instead of that language that the Court used, that the defendant willfully failed to placard and provide the appropriate shipping papers as required by the regulations and that the defendant had knowledge that his conduct was unlawful under Element 3.

So as to Elements 1 and 3, we have no objection. As to Element 2, we do have an objection and we would request that that language be inserted.

THE COURT: So what you're asking is that the Court give a specific -- impose a specific requirement that the government prove beyond a reasonable doubt that the defendant knew of the placarding requirements?

MR. VIETH: Yes.

THE COURT: Do you want to respond?

MR. SUTCLIFFE: Just briefly, Your Honor. I think the way it's set out tracks the statute completely, and I think that's all that's required.

THE COURT: I am going to overrule the objection. I reviewed the *Bryan* and Sheets -- no, *Cheek* decisions. *Cheek* is another question, which I think was actually quoted in *Bryan*, but the *Bryan* and the *Cheek* decision? And there the Supreme Court, I want to say Justice Stevens, but whoever wrote the opinion specifically acknowledged that in most

1  instances where the willfulness requirement is imposed,
2  the government is only required to prove that they knew
3  that their conduct was unlawful, and noted two
4  exceptions.
5      One is in the area involving the Internal
6  Revenue Code and perhaps in money structuring
7  transactions and prohibitions on the grounds that in
8  those instances the Court had historically, but not
9  consistently, imposed a requirement that the government
10 prove specific knowledge of the law being violated,
11 that that was because of not only the complex nature of
12 the statutory requirements, but also because of the
13 somewhat subtle distinction between what is lawful and
14 what is unlawful under the Internal Revenue Code.
15     First, I don't think we have that situation
16 here. Although the regulations are not without their
17 complexity, I don't think they are the kind of
18 regulations such as the Internal Revenue Code where
19 conduct is often subtly distinguishable between lawful
20 and unlawful conduct.
21     But secondly, and more importantly, the
22 statutory language here is specific, that they defined
23 willfulness as including, essentially, Elements 2 and
24 3; that is, that the defendant had knowledge of the
25 facts giving rise to the violation and the defendant

1  had knowledge that their conduct was unlawful.
2      It is hard for me to see how giving an
3  instruction as to willfulness that tracks almost word
4  for word and certainly in substance with the statutory
5  definition is somehow in error.
6      So I am going to overrule that objection and
7  find that, A, I guess it's unnecessary because the
8  regulations here are really not quite like the Internal
9  Revenue Code, and second, unlike the Internal Revenue
10 Code, we have a specific statutory definition of
11 willfulness, which the Court has, I think, faithfully
12 copied into the elements instruction as Elements 2 and
13 3.
14     So are those the only objections then,
15 Counsel, to the proposed charge to the jury and the
16 verdict form?
17     MR. VIETH: Yes, Your Honor.
18     THE COURT: From the government?
19     MR. SUTCLIFFE: No objection.
20     THE COURT: All right. With that then,
21 Counsel, these will be the instructions that we will
22 give to the jury at 9:00. Let's go off the record.
23     (Off the record.)
24     (Whereupon, the Court recessed.)
25     * * * * * END OF REQUESTED EXCERPT * * * * *

1              P R O C E E D I N G S
2                  June 18, 2007
3                    --oo0oo--
4    * * * * * BEGINNING OF REQUESTED EXCERPT * * * * *
5
6                _CLOSING ARGUMENTS_
7      THE COURT: Ms. Mallard, are you going to give
8  the closing argument?
9      MS. MALLARD: Yes, Your Honor.
10     Play fair and clean up your own mess. These
11 are two rules from the famous book "All I Really Need
12 to Know I Learned in Kindergarten." And these two
13 rules from that pretty much sum up the RCRA and DOT and
14 hazmat regulations that are at issue in this case, and
15 they also sum up the reasons why we have those kinds of
16 regulations. Play fair and clean up your own mess.
17 Two rules that Mr. Evertson didn't live by.
18     In Counts 2 and 3 in your jury instructions,
19 the government says that he stored hazardous waste
20 without a permit. But that's just a really dry way of
21 saying that he dumped tons of hazardous materials,
22 sodium metal and sludge, in tanks and drums on Robert
23 Chaffin at Steel and Ranch Supply and left Mr. Chaffin
24 holding the bag full of explosive garbage.
25     In Count 1 in this case we allege that he

1  violated DOT regulations, willfully violated them by
2  failing to properly placard and give proper shipping
3  documents to transport those hazardous materials. That
4  is just legal speak for saying that he sent those
5  dangerous materials down the road from the Tanner
6  Building to the Steel and Ranch Supply without taking
7  any steps to protect Robert Chaffin, his friend, or the
8  other people of Salmon, who were nothing but kind to
9  him.
10     Mr. Evertson started a business called SBH
11 Corp to make sodium borohydride. He spent $100,000 to
12 try and develop that chemical. He put a lot of time
13 and effort into it. There's no question that he worked
14 hard on developing this process.
15     He entered into a business arrangement with
16 his brother-in-law, Tim Sundles, and his sister Diana
17 Sundles. And they all had high hopes of making a lot
18 of money off this process. No harm in trying. In
19 fact, we like that kind of behavior in America. We
20 like inventors that can create better ways of doing
21 things.
22     But the harm came when Mr. Evertson ran out of
23 money, couldn't make the process work and walked away
24 from 10 tons of sodium metal that he had ordered from
25 China and delivered in Salmon. Not a couple of hundred

pounds, not a couple of pounds, not a couple of tons; 10 tons of sodium metal shipped from China to the United States. That's when the harm came.

By the time Mr. Evertson had spent a year working on this process, his enthusiasm had waned. I'm sure that when he ordered that 10 tons of sodium metal and had worked at his process and figured that he was going to better the patent that was already in place, his enthusiasm for this new adventure was high. He was excited. But after a year of trying to make that process work and being unsuccessful, his enthusiasm had diminished considerably, is my bet.

By then, nobody knew better than Mr. Evertson how hard to get rid of that 10 tons of sodium metal would be and the sludge resulting from the processes that hadn't worked. His notebooks show that. The shipping documents that said "Hazardous," "Dangerous When Wet," and the labels saying "Dangerous When Wet" didn't tell Mr. Evertson anything he didn't already know about sodium metal and the resulting sludge from his experiments. He already knew that it was dangerous.

His partner, Mr. Sundles, didn't want to store that stuff on his property, did he? Play fair and clean up your own mess.

Now, we have a timeline here that you can refer to as we go through these facts. You can see that early on, in September of 2000, everyone was excited about this process. Things were being ordered. Buildings being leased. Moving equipment in. Stuff was being delivered.

In 2001, shipments were being delivered of the sodium metal in two separate shipments. But in a little over a year, the dream had died and Mr. Evertson has the sodium and tanks moved to Steel and Ranch Supply. You can refer to that timeline as we go through the evidence.

In the evidence that the government presented in this last week, there are a number of undisputed facts and testimony that overwhelmingly support our case and the charges against Mr. Evertson. Let's review those undisputed facts.

First of all, Mr. Evertson ordered and received 10 tons of sodium metal from China. He received that in Salmon in the process to try to make sodium borohydride. And Exhibits 2 and 3 show that. You can see on the originals that they have these orange tags showing "Hazardous Materials" in both of those documents. You can see in this copy that I've highlighted that "Hazardous" is circled and surrounded

by stars in the original document. I've highlighted it. It also shows "Sodium, Dangerous When Wet, Emergency Contact." And you see Mr. Evertson's signature on that document.

The second shipment is similar. It also shows "Hazardous" with stars around it, "Dangerous When Wet," and Mr. Ericksson's signature on that document showing that the materials were hazardous.

Mr. Evertson, it's also undisputed, hoped to make a lot of money out of this process.

Mr. Evertson, it's undisputed, did not figure out the process before he left Salmon in 2002. He at that time needed a bigger pump and some propane, and apparently that was enough to stop him from pursuing the dream of making sodium borohydride.

Mr. Evertson talked Mr. Chaffin into storing his materials, his sludge and sodium metal, in Mr. Chaffin's Steel and Ranch Supply yard. Mr. Chaffin testified that he didn't want to do it, that Mr. Evertson asked him several times before he finally agreed to go ahead and store it after Mr. Sundles had said he didn't want to store it in his yard. Mr. Sundles didn't want the sludge and tanks and drums on his property, he testified. He told the EPA he didn't know how to handle it and didn't know what to do

with it. That's undisputed.

Also undisputed is Mr. Chaffin's testimony that before moving those materials from the Tanner Building down to his yard, inside of his own small home he asked Mr. Evertson if there was anything in there that he needed to worry about, and Mr. Evertson said no. He said that in spite of the documents that he had received that say "Hazardous." The same sodium metal that he's shipping down the road, he tells Mr. Evertson, "You don't need to worry about that."

Mr. Evertson, after he left the sodium metal, the tanks and the drums at Steel and Ranch Supply on August 1st of 2002, never again contacts Mr. Chaffin about the materials. Mr. Chaffin testified that he had a personal phone call asking how they were doing around the holidays a few months after he left the supplies there, but there was no discussion of the materials and never again did Mr. Evertson contact Mr. Chaffin about the tanks and drums, the sludge and the sodium metal and the other items left there at Steel and Ranch Supply.

There's no dispute that Mr. Chaffin wanted the tanks and drums off his yard after the first year was up. There's no dispute that the agreement was for one year. That was according to Mr. Chaffin's testimony,

## Page 33

that he said, "Only one year is all I want to store this. I don't need any more borax than a year's worth and I don't want it any longer than that year." This is corroborated by his reluctance initially to even store the materials there until Mr. Sundles had asked repeatedly and been turned down by other people.

Also admitted was Government's Exhibit No. 12. This is undisputed. It says involuntary bailey, excessive control. Then voluntary bailey, responsibility for item. A bailey is someone that you leave your things with, somewhat like a storage unit. Responsibility for item with the voluntary bailey. That paper is dated before he left -- or I should say the notebook surrounding it indicates that the date and the knowledge of that is from before he ever asked Mr. Chaffin to store his materials at Steel and Ranch Supply.

Neither Mr. Chaffin nor his father could find any further contact information for Mr. Evertson after he left Steel and Ranch Supply, promising to be back within a year. At the end of a year, he'd be back. He left them an e-mail address. It couldn't be used. They tried to get ahold of him. No answer to the e-mail address.

Mr. Chaffin and his father contacted the

## Page 34

Sundleses numerous times trying to find out where Mr. Evertson was, and they gave him no information about that. They had no idea where to get ahold him. They had no forwarding address, no phone number. Mr. Evertson left them holding the bag with no way of getting in touch with him.

The Sundleses said they didn't know how to contact Mr. Evertson, as well. And they were his business partners, initially.

Mr. Evertson made no more claims on the tanks and drums left at Steel and Ranch Supply after he left them there. That's undisputed.

Tim Sundles told the EPA that what was in the tanks was waste and he denied ownership of them. The EPA treated the drums and tanks as waste. The FBI treated the drums and waste. Mr. Evertson knew there would be waste from the process, according to his notebooks. You can see from his calculations that he knew there would be waste in this process, and that was what was left in the sludge and in the tanks. Mr. Chaffin assumed that it was abandoned property. You can see from his access agreement that he signed, that Mr. Chaffin signed, that it was abandoned property to Mr. Chaffin, and that's Exhibit No. 62.

Terry Gregory from the EPA testified that no

## Page 35

permit was issued to Krister Evertson, Krister Ericksson, or any variety of name by the EPA. No permit issued. Undisputed.

Mr. Ross and Mr. Overpeck testified that the sodium metal was reactive. And you saw the video. Mr. Overpeck testified the sludge in the tanks were so reactive that as they were sloughing it out, sparks would show up along the edges when they were shovelling it out. That's how reactive it was. Mr. Boyden testified that in 20 years of lab work, he had never seen a sludge sample respond and react in the way that the one that came from the sludge tanks at Steel and Ranch Supply reacted.

Mr. Evertson knew that the material and the resulting sludge was reactive. This is from his notebook showing that the sodium, the NaOH, blew up the flask. Abort, it says. Blew up flask. He knew it was reactive.

All of these facts prove overwhelmingly that on Counts 1 and 3, Mr. Evertson stored hazardous waste at Steel and Ranch Supply without a permit and beyond a reasonable doubt.

Let's review the jury instructions associated with these two counts. That would be Instructions No. 17 and 18. What the government has to prove is that

## Page 36

the defendant knowingly stored or disposed of or knowingly caused others to store or dispose of hazardous waste in above-ground storage tanks. Those are those big tanks you saw, the one that was cut open and had the sludge that was so reactive in it.

Knowingly store it. There is no question, no dispute in the evidence that he stored those materials, had the Chaffins store those materials in above-ground storage tanks at Steel and Ranch Supply. That element is proven with no dispute in the evidence.

The defendant knew that the material in the above-ground storage tanks at Steel and Ranch Supply had the potential to be harmful to others or to the environment.

Well, we have just gone over the evidence that shows that. Certainly, Mr. Evertson, with his really quite impressive scientific knowledge, as well as the notations in his notebook and the shipping documents, materials, what he knew about sodium metal, he knew that had the potential to be harmful to others, that the hazardous waste was identified as a hazardous waste by the U.S. EPA pursuant to RCRA. Mr. Ross, Mr. Callaghan both testified to that. Mr. Ross showed you the exact code section that applied to that. So that has been proven without dispute.

The defendant had not obtained a permit from EPA or the State of Idaho authorizing the disposal of hazardous waste under RCRA. As well undisputed by Terry Gregory's evidence that there was no permit.

If you go to Instruction No. 18, we go through the same elements, only we're talking about the drums, the 55-gallon drums containing sodium metal instead of the above-ground storage tanks. As well, those elements have been proven beyond a reasonable doubt.

Let's look at Instruction No. 19. It's got the definitions. Storage means the containment of hazardous wastes, either temporarily or for a period of years in such a manner as to not constitute disposal.

They were stored there. We all know what stored means, and clearly these items were stored at the Steel and Ranch Supply yard.

Hazardous waste. This definition includes a solid waste -- which is defined on the next page and we will talk about in just a second -- a solid waste which, because of its quantity, concentration or physical or chemical characteristics, may react violently with water, which is what we have here. All the tests from STL and Ecology & Environment and Mr. Overpeck's haz catting, a new word to me, his haz categorizing right there on site, Mr. Ross's tests all

prove overwhelmingly that both the sludge and sodium metal reacted violently with water, and they also showed that the sludge had a pH greater than or equal to 12.5.

Solid waste means a discarded material which, in turn, is defined as an abandoned material. A material is abandoned if it is being disposed of or if it is being stored before or instead of being disposed of.

And this is what we claim. Certainly, the sodium metal in the drums was not a waste product from the process that Mr. Evertson was trying. It was new material. But because Mr. Evertson left it there in the Steel and Ranch Supply yard, it was abandoned. It was left there instead of being disposed of in any other way.

So it become a waste when it was left there. Certainly, the sludge that was at the bottom of the process tanks, that is, I think, no question, is clearly a waste, just like we think of any other kind of garbage that we don't need.

In addition, on Count 1, the hazardous materials transportation charge, that's charged -- your instructions are in No. 11. We also have undisputed evidence. And as I go through the evidence, I'll point

to the elements of this instruction.

First of all, Mr. Evertson offered sodium metal to Mr. Chaffin for transporting down the road to Steel and Ranch Supply, and that is the facts giving rise to the violation. That's number 2. The defendant had knowledge of the facts giving rise to the violation. The facts are that he offered that stuff to Mr. Chaffin to transport it down the road and that it wasn't properly placarded or given shipping documents. And that's what number 2 is. There is no question that he gave that to Mr. Chaffin and asked him to take it down the road. He knew that.

Mr. Evertson received and signed shipping documents that we have looked at before, number 2 and 3, that says "Hazardous." Tagged hazardous materials all over here. It's got a packing group number, UN number, sodium, dangerous when wet, hazardous. From this document, you can infer that Mr. Evertson knew that his conduct was unlawful because those regulations were in effect.

But in addition to those shipping documents, we also have two separate documents that were found in his papers in Alaska. One is Exhibit No. 14, an MSDS sheet with the notation 4.3, PG-1 and UN1426. Those are DOT regulations notations. As well, we have

Exhibit No. 10-131, also showing DOT 4.1, UN No. 1416, Packing Group 3.

I don't know about you, but until this case was presented I had no idea what PG-1, 2, or 3 meant or what a UN number was. Mr. Evertson knew. He knew from an early date. Those papers are dated in 2000 or 2001. If you look at the date on the bottom of Exhibit No. 14, it's clearly dated 2001. The other exhibit, if you look at the surrounding notebook pages, it's from 2000. From that period on, he knew about DOT regulations and what were required with dangerous materials, hazardous materials.

He told Agent Espland in Alaska, Agent Espland from the FBI, that he was familiar with DOT regulations. He maybe minimized his knowledge to Agent Espland, but he said, "Yes, I am familiar with them." That's undisputed.

Also undisputed, once again, is Mr. Evertson's action of not telling Mr. Chaffin, even when asked, what was in those materials. You can infer from that that he knew what was in there, that somebody should know about it when it was being shipped, and that he chose not tell Mr. Chaffin for one reason: Because he didn't want Mr. Chaffin to back out of the agreement to store those materials.

Mr. Chaffin testified that he would not have store those materials if Mr. Evertson had told him what was in there. That testimony is undisputed.

Mr. Evertson knew about the RCRA regulations in Exhibit No. 12. RCRA and non-RCRA. He was familiar with those kinds of regulations.

Mr. Evertson's responsibility, you can see in Exhibit No. 15, is that he was to procure all equipment and raw materials needed to make SBH, sodium borohydride, and to ship SBH. It was his job to ship and transport the sodium borohydride and the materials required to make it. That was his job. And the evidence in his notebooks and in the other papers that the government has shown you indicate that he knew what those regulations were.

You also see from these documents, the shipping documents and the other documents in evidence that we have just shown you, that Mr. Evertson didn't have any trouble getting that 10 tons of sodium metal from China to Salmon, but then he couldn't get it from the Tanner Building down to Steel and Ranch Supply properly. And why is that? Because his motives had changed by then. When it came from China, it was a gold mine to him. When it went from the Tanner Building down to Steel and Ranch Supply, it was garbage

and a burden to him.

The defense claims that this wasn't hazardous material or that this wasn't waste; this was valuable material, that he was just in the process of using it, storing it until he could get things going again. That's what the defense claims.

Does that look like valuable material? Does that look like someone is in the middle of using it? Does the wear and tear on those materials look like something that's valuable to someone? The rusty and corroded tanks with the labels falling off and coming apart, does that look valuable? Does that look like it's in the middle of a process stream about to be nickel plated or put in a jar? No. It looks like garbage.

Look at Mr. Evertson's behavior. He walked away from these supposedly valuable materials and never again contacted Mr. Chaffin about them. He didn't stay in contact with his business partners, the Sundleses. He told Mr. Chaffin that he was going to come back in a year, but never showed any evidence of actually doing that; not a bit.

Mr. Chaffin certainly wouldn't have stored the tanks and drums if he would have known Mr. Evertson was going to be gone indefinitely. He testified to that.

Mr. Evertson certainly couldn't be found when the Chaffins started looking for him, when they were tired of storing the goods and when the rent had run out months previous.

Mr. Sundles said that it was waste in the tanks, in these tanks right here. Mr. Sundles said it was waste when the EPA asked him and said it wasn't his. He didn't want it.

Sundles, perhaps craftier and not as kind as Robert Chaffin, refused to store this in his yard and on his property.

Look at the time frame. In August of 2002, Mr. Chaffin reluctantly agrees to store the materials there in exchange for a bag of borax; for a year, he says. And Mr. Evertson promises to be back in a year.

At the end of July, the rent is up and there's no contact from Mr. Evertson, no contact to say, "Hey, I'm out of money, but would you please hang on to my stuff a little longer?" No contact. "I'm having some trouble getting back there, but I want my stuff. Would you please take care of it and make sure it's covered up?" No contact whatsoever. No, "Hey, has anything changed in your life? I still need that stuff. Here's where you can find me if you want to move the stuff again or if you want to give it back to me." Nothing.

No contact.

By March of 2004, Mr. Chaffin and his father are trying to contact the Sundleses. They do it numerous times with no success in locating Mr. Evertson.

The Sundleses say that they can't contact Mr. Evertson. They say they talked to him once, but they don't know where he's at or how to contact him. And they say they tell the Chaffins that. Those are the business partners. Clearly, by this point the business is defunct. No one has any hope of reviving it. The materials are no longer valueless, but now a nuisance.

In May of 2004, the EPA comes in and takes care of the garbage that has been left there, the waste that Mr. Chaffin has never once -- or Mr. Evertson, excuse me, has never once contacted the Chaffins and told them, "Hey, I need this stuff. Keep an eye on it. I'm coming back. I know I haven't paid you back, but I'm coming back. Hang on to it for me."

You wouldn't store something worth even a small value to you in an open yard in Salmon, Idaho, where you have severe weather in the form of snow and wind and rain and ice and high and low temperatures unless that was not valuable to you. That's not what

you do with something that has any value to you whatsoever. You wouldn't pay rent for the storage of an item for a year and then quit paying and not have any contact with people, and yet the defense wants you to believe that this was valuable material to Mr. Evertson.

But what would you do if you wanted to get rid of something? What would you do? A pretty good plan is to put it into storage and not let anybody know where you went, not letting anybody know how to contact you. That would work. You would leave no forwarding address with the people with whom you're storing your materials that you don't want anymore. You wouldn't care what kind of condition the materials were in, if it wasn't valuable to you. You wouldn't care how exposed to the elements those materials were. You would stop contact with your business partners, who also had an interest in the product, and you wouldn't care if your corporation had lapsed. In fact, that would be one less way of getting in touch with you, if the corporation was out of business, was revoked.

The defense also claims that Mr. -- will claim that Mr. Evertson had no knowledge of the DOT regs. But as we've shown already, these documents in his possession clearly show that Mr. Evertson knew about

DOT regulations. As well as the shipping documents that we have already seen, the shipping documents are clearly marked and would put anyone on notice that these materials had to be handled in a special way once you received them. Look at that bright orange tag on both of these documents indicating special handling. If you receive something like that, you would think twice about sending it anywhere else without looking into what you had to do. Clearly, Mr. Evertson had done that looking into that he had to do. He knew about DOT regulations.

The defense promised in their opening that their expert would show that this process worked. Well, the expert testified that, theoretically, it could work, and that was with bad math. But he didn't know. He testified that he didn't know anything about the broken pump that Mr. Havemann testified about, the lack of funds to carry on, the defunct corporation, the lack of propane needed, or finally, just the plain lack of will to make it work. And he certainly didn't seem to take into account these photos of materials that don't look like anything that's in the middle of being worked on. It doesn't look like any intermediate process stream to me. It looks like something that has been discarded and is no longer needed.

The expert witness also testified that the secretiveness of Mr. Evertson was perfectly understandable because of the value of this patent. We have no argument with that. That is a perfectly rational approach when you're trying to do something that's going to make you a lot of money and that you are trying to be innovative about. But what he doesn't take into account is that there was -- and we even agree that the kind of materials you use may give a secret away in certain circumstances.

But in this case, and you may not be able to see it well, you can see it -- you will be able to see it in the jury room, but in these documents borax, mineral oil, sodium are all over this patent that had already been obtained. There was nothing secret about the ingredient sodium, borax. And certainly the sludge was -- I guess you could say it was a big secret. The government couldn't figure out what it was except it was highly reactive and in the bottom of tanks; certainly garbage, waste.

He didn't have to be secret about the materials to keep the information of the process away from anybody. The only reason he had to be secretive about those materials is so Mr. Chaffin would store them on his property because Mr. Chaffin testified he

would not have stored them if he would have known about it.

You may wonder about the labels on the barrels. What did Mr. Chaffin say? His dad was in the recycling business, and you never knew when something was reused or not. Mr. Evertson knew what he had in those drums and tanks, and he knew for a good year before he ever unloaded them on Mr. Chaffin.

Nothing is simpler than finding, in Jury Instruction 17 and 18, beyond a reasonable doubt that the government has met each and every one of those elements.

With the evidence presented in this last week, the government has proven beyond a reasonable doubt, beyond any doubt that Mr. Evertson stored those materials, that hazardous waste, at Steel and Ranch Supply without a permit. That's all we claim, that he stored them there without a permit, and the evidence proves that overwhelmingly.

Not much more difficult is finding that he knew about the DOT regulations and he willfully violated them when he shipped and transported that material down to Steel and Ranch Supply.

The Chaffins, Mr. Dalrymple, Mr. Havemann, all those people couldn't have been kinder and more

welcoming and more helpful to Mr. Evertson. And how did he repay them? He repaid them by dumping tons of hazardous waste in Mr. Chaffin's backyard and in their town of Salmon, Idaho.

He didn't follow the rules, play fair, and clean up his own messes. He didn't play fair when he didn't let Mr. Chaffin know, even when he asked him what was in those drums and tanks. He didn't clean up his own mess when he walked away from Salmon, leaving those drums and tanks full of nasty corrosive explosive materials to rust and rot and disintegrate. That's not cleaning up your own mess.

He didn't play fair when he never contacted Mr. Chaffin again about those drums and tanks, and he didn't play fair when he wanted to make the profit for using that sodium metal. But he wanted Robert Chaffin to bear the burden of possessing that sodium metal and the waste associated with those innovative processes.

Play fair and clean up your own mess. Those are good rules to live by. They're rules that protect the people around you. They're rules that keep your neighborhood safe and clean, rules simple enough that you learn in kindergarten, and rules that Mr. Evertson did not live by.

THE COURT: Thank you, Ms. Mallard.

Ladies and gentlemen, I think we will take the morning break at this point and return and hear the closing arguments of the defense, after which the government will have a brief rebuttal. And then I'll give you some final closing instructions, and then after that you will begin your deliberations.

Until we have reached that point, though, you are to continue to follow the Court's admonition not to discuss the case among yourselves or with anyone else, nor should you form or express any opinions about the case until it is finally submitted to you.

We will be in recess for 15 minutes.

(Whereupon, the Court recessed.)

THE COURT: For the record, I will note that all jurors are present.

With that, Mr. Vieth, you may make your closing argument to the jury.

MR. VIETH: Thank you, Your Honor.

Good morning. The government this morning suggested to you that these are rules of kindergarten, that they're easy to follow. Kindergarten rules.

In the last week we've been talking about RCRA, CERCLA, Department of Transportation, the Codified Federal Rules, rules that the witnesses here testified are complex, difficult to understand. These

are not rules for kindergartners. These are tough rules.

Mr. Evertson is an inventor. He's a chemist. He is a small business owner. He's a quiet man. He doesn't communicate real well. He's a thinker. He's a creative person. He's not a shipper. He's not a trucker. He didn't have a large corporation here. It was a small corporation. And the biggest issue I guess I have is that he's not a criminal. We saw people, his friends, get up there and tell you that he's not a criminal, that he's an honest man, that he's a law-abiding man; Officer Shelton, Mr. Phillips, that's who he is. He's not conniving. He's not a dishonest man. He's not somebody that's sneaky, trying to dump things off on Mr. Chaffin. This was his dream.

Looking through those notebooks, and there's three of them, there is a notebook back in 1998 and there is a notebook right around the 2000s and there is also a notebook around 2001 when he's in Salmon. And looking through those notebooks and comparing what he did with patents and all his inventions, different heating, different combinations of things, trying things out, ideas, inventions, this was his life. Five years he worked on this. That's a long time. And the government suggests that he's just going to throw

it away, that this is waste, that this is garbage, that this is his future, and he chucks it?

Last Monday, I guess I put out two propositions that we had issue with. The first one is, and that goes to willfulness, and that goes to Count 1. Right there, Count 1. You've got to know the rules, and then you've got to break the rules. You have got to be a dishonest man. You've got to know those CFRs. And the instructions will show you what he needed to know. These are the complicated rules that Officer Wright talked about, rules that change not only yearly, but maybe even a couple times a year, possibly even monthly. This is not kindergarten rules.

And the second proposition was the abandonment, and that's what we've spent most of our time on and that's what we've been adamantly defending against. We did not abandon these things.

And the government showed us some pictures. This is one of the pictures. Now, we have stipulated that this barrel, and I don't want this to scare you and I don't want the government to mislead you, this did not contain anything. This was empty.

And here you really can't see the fence that it was behind either. This picture, you can. And that's a fact.

          Another picture that the government showed you is this picture. Well, below here. And this will all be brought back with you in the jury room. Tarps. Tarps that fell off of something and tarps right below this.
          Furthermore, on the top the government suggests, why would you leave this out in the weather in Salmon? Fair enough. That's why you put tarps over your motors, to keep them safe from the weather.
          And also this picture -- it is an ugly picture because of the stuff that's falling off here -- well, this is insulation. All that is insulation. Insulation is used to keep everything warm so that when someone heats this up, it's easier to do, easily replaced.
          For instance, the government had no problem taking off that insulation when they hauled it away. Same drum. No insulation. It's an ugly picture. And that's what they want you to think.
          But this is the picture that I point to. This is the picture, May 29, 2004, tarped product. Mr. Chaffin testified that he wanted to make sure Chris's stuff was taken care of. That's what he did. He took care of Chris's stuff. Why do you take care of someone else's stuff? He's coming back down. He told

Robert that.
          And the government wants you to think that this is -- I don't know how many times they said hazardous, volatile. That's no lie there. That's straightforward and honest. They say a picture is worth a thousand words. I think that's more.
          Looking through the rules, and this goes right to the willful instruction, and I circled this, and you will see this in Instruction 11, this has been our issue from day one with this case. This word right there: Willful. On purpose.
          Going down to the actual elements, these are the two that we'd ask you to concentrate on. Know the rules, break the rules, because in order to break them willfully, you have to know them first. And that's why we talked to Mr. Wright about that, Officer Wright, how complex this stuff is. These are not easy to grasp. This is not as simple as looking at the truck driver's invoice and signing off on it.
          MS. MALLARD: Your Honor, I would object. He's misstating the rule. He doesn't have to know the facts, the law.
          THE COURT: Ladies and gentlemen, I will instruct you to follow the Court's instructions as to the law applicable here. To the extent counsel has

misstated the Court's instructions, you are to disregard that.
          I will sustain the objection.
          Counsel, I think the third element does refer to knowledge of facts as opposed to law, so I'll sustain the objection.
          MR. VIETH: As to the rules, Officer Wright did go into depth. And I don't know how many books he had up there. I think I counted four. But those are the rules we're talking about.
          Mr. Overpeck. I believe his name is Carl Overpeck from the EPA. He testified that they have people that specially -- that their job is to look into DOT rules. That's their job.
          Agent Espland, the FBI agent that interviewed for five hours, talked to Mr. Evertson for five hours, went through everything. SBH Corporation, how was it formed? Why it was formed? Who formed it? The $100,000? Addresses. Names. He went into depth, on and on. That's a pretty long meeting with an FBI agent. And also the agent asked him about DOT rules, and the agent testified he got it from Ebay, copied them down.
          He also testified as to the specifics. He is not familiar with shipping names, labeling, placarding,

or shipping documents. That's not to say he doesn't know about them; not familiar with them, comfortable with them.
          Mr. Dalrymple -- and we've seen his invoices -- these are invoices that he kept. Why didn't he keep them? It's a receipt so in case SBH Corporation comes back and says, "We only got 75 drums instead of 80;" "No, you didn't, right here you signed off on it, 80 drums." That's the reason for the receipt. It's not to educate. And Mr. Dalrymple said that. "I didn't go through placarding. I didn't go through the rules. I'm a truck driver. I helped him out. I took all that stuff off for him. I helped him move it in."
          The MSDSs. A copy from Ebay. Does this say anything about proper placarding, shipping, all those rules that Mr. Wright went into? And furthermore, this is only the single page, the front page. That's all we had.
          Furthermore, and I guess we didn't get into this very much, but the documents are in and it's in our exhibits, and this is our Exhibit F, and the front page looks like this, and this is a letter.
          THE COURT: What's the exhibit number, Counsel?

MR. VIETH: F, Your Honor.

Also contained in this exhibit, and it goes on about the negotiation for the sodium.

The government suggested we should have known because we transported it all the way from China.

We have nothing to hide here. This is the Chinese receipt. That's why I gave it to you. On and on. Nothing about placarding. Nothing about manifests. It's an invoice. Insurance. And this is all in evidence. Receipt. A certificate. Everything.

Abandonment, and this is where the definition section is instructive, and I believe it's in Instruction 19.

Instruction 19 tells us what this term is, and this is the term that we've been using over and over again; five days last week, and we'll use it this morning. Hazardous waste. This tells us what hazardous waste is. A solid waste or a combination of solid wastes.

So what is a solid waste? If you turn the page, we have that definition present. A solid waste means a discarded material -- garbage, thrown away, abandoned -- which, in turn, is defined by an abandoned material. Abandoned material is if it is being disposed of or it is being stored of before or in lieu

of being disposed of. Abandoned. That is why we have harped on this and that is why we spent some time on it.

And if you look through those notebooks, you'll see how much time and energy. If you look through the formation of the corporation, you'll see how much time and energy. If you remember through the testimony, how long Chris worked on this. I think Mr. Dalrymple said he would drive by there, always in there. I think Sheriff Sam Slavin testified as well, always in there. Wondering what he was up to.

That's why they were interested. It's a small town. You see a guy's car parked out there 24 hours a day, small town says, "I wonder what he's doing?"

Well, the sheriff did get to go in there. He walked around. He looked around. Chris explained it to him. I think the sheriff described it as a poor boy scout. Well, add that to the list as well. Not a criminal.

Mr. Malachowski testified that this was a process, that Chris could have hooked this back up, more heat, started it again. That's why he put it in storage. Heat it up, turn it on, start it again.

He did tell people -- remember, he's a quiet man and he doesn't communicate real well. But

nevertheless, he did tell people. He told Tim, Mr. Sundles, at least once, "I've got to go to Alaska to make more money. We're out of money, out of propane. Can't get it heated. Got to go up there to mine."

Robert Chaffin. Out of money. In fact, remember he gave him a gold coin? That's all he's got. He doesn't have any more money. "I've got to go to Alaska, make more money, come back down. Will you put my things in storage?"

As a favor, he did. As a friend, he did. He took a little bit of payment, and that payment was borax. Robert says it's 1000 pounds of borax. Super sack. 1000 pounds. That's wrong. A super sack is 2000 pounds. Robert says one year, 1000 pounds. One year. What's 2000 pounds?

And along with -- and these are Defendant's Exhibits G, H, I, and J, and they are the invoices that the corporation put together, the mineral oil, the money they spent. I wanted to show you that.

But this is H, and this is another receipt. And you'll have this back in evidence. And this is the borax. This is the borax in the big sack, the super sack, the sacks that Robert covered, made sure it was covered. With water, they turn hard. Right here, and

you'll get the original of this, 32,000 pounds. 16 of them. 32,000 pounds.

Second page. Down here at the bottom under packaging you'll see, first off, borax right there, semi-bulk bags. 2000 pounds. That's what he got. There may have been a misunderstanding, but that's what he got. And he was able to use it all up. He sold it. Good.

And as to the communication, there was communication. There was a phone call. When that phone call was, Robert first testified that he thought it was right after Mr. Evertson left. But also when I was asking him, he said it might have been in 2003. This was a long time ago. He didn't remember. But there was conversation there. And at no time did he bring up rent or additional rent. He got his rent. He got his borax. And, in fact, it shows here, this picture, if I can find it -- again I'm pointing back to this picture because I think it says a lot. It says a lot about Robert, his friend. This was right before -- two days before the EPA got there. Covered up, okay? Robert was taking care of his friend's stuff. That's what a friend did.

As to the reactivity -- and the government indicates that the sludge they say was in that tank was

61

highly reactive. And there's an exhibit in their binder that does say that it's highly reactive, and you'll see this. You'll see this right there in their binder. This stuff was hazardous. But remember talking to Mr. Ross, the government's expert. Talking to Mr. Ross about the sample, he went up to 250 degrees Celsius. I think that's almost 500 degrees Fahrenheit. Hot. And what did he get off of it? A little smoke.

And we heard from Mr. Malachowski. If you put together a corrosive and an acid, you're going to get a reaction. And that's what they got.

Throughout this whole trial, in no way have we suggested that this is not hazardous. Elemental sodium is hazardous. The point that we have tried to make is that in no way did we throw it away.

The EPA in this case, Mr. Callaghan testified in looking to this consent form. And along with that picture saying a thousand words, I think this consent waiver does, too, and this is in the government's evidence.

If you remember the testimony, Mr. Callaghan testified that Mr. Chaffin said it was abandoned. He testified that this is on his computer, and he testified that on his way up to Montana he was writing this out. Abandoned.

62

To me that suggests that the EPA made up their mind before they were even on that site. They say abandoned before they even get there, before they even have consent to be on the property.

As to the counts, and I'll just briefly go over this, the willfulness count is clear. Willfully know the CFRs, know the rules, and break them. And looking to the rules, these are the rules. All this. In Instruction 12 and 13, that's what we knew. No.

Next looking to Count 2 and 3, again waste. That's the first step. You've got to get to waste. They have to show this is disposed of. They have to show that this is abandoned. We threw it away. We didn't want it anymore. All our hours of work, days of working without pay, all of the money spent, things are on pallets, things are on trailers, given up.

And second, under number 3, that the hazardous waste was identified as hazardous waste by the U.S. EPA. They identified that it was abandoned, or that somebody else, because this piece of paper suggests otherwise, that they had already made up their mind before they even got out there.

So, first, they have to convince us that it's waste. Second, that they made the identification.

In my opening those were the two issues, and

63

those two issues remain. That's why we're here. And throughout the last week the government has not proved its case. They have not proved beyond a reasonable doubt Counts 1, 2, or 3 as to the rules or as to our abandonment.

With that we'd ask you to go back, review everything. Take your time. I know it was a long week last week. And some of the stuff is complicated and muddy. I guess that's the best way to describe it. But Mr. Evertson's liberty is on the line, and we'd ask you to go back and take your time and review everything because it's very important to us.

Thank you.

THE COURT: Thank you, Mr. Vieth.

Mr. Sutcliffe, if closing arguments are split up between counsel, I would just remind you not to overlap and to make this truly a rebuttal argument. But go ahead --

MR. SUTCLIFFE: Thank you, Your Honor.

THE COURT: -- and try not to overlap with Ms. Mallard's arguments.

MR. SUTCLIFFE: This will be brief.

Good afternoon, ladies and gentlemen, Ms. Mallard never suggested to you that the rules were simple. What she did was make an analogy, the concepts

64

of things that we learn in kindergarten and we know in our every day about cleaning things up or not hurting people. She never said the rules were simple, but they actually are, and I'll explain that in a minute.

But Mr. Vieth first suggested Mr. Evertson had some people come in and testify for him that testified that he was a truthful guy, honest guy, that sort of thing.

I'm sorry. Your friends don't come in and say, "Yeah, now that I think about it, the guy's a criminal." It just doesn't happen. When friends come in, they testify they are a good guy. And you should discount that kind of testimony when you hear things like that. Use your common sense to address those sorts of issues.

As for the, you know, the fact that this was the defendant's dream and he was trying to heat this stuff up and all of the notebooks, Mr. Vieth urged you to go look at the notebooks.

Do look at the notebooks because when you look at those there is page after page after page of complex chemical formulas. There's indications that this guy understands how to write down packing group numbers. There is indications that he understood RCRA. There is complex drawings showing waste at the bottom of these

65

tanks. Anybody that's smart enough do that, I would submit, is smart enough to go look up a hazmat regulation. And if you're not, you can call ISP. It would take five minutes. It's not that hard.

The best evidence you have got in front of you for that is Exhibit No. 14. That shows you he wrote down the packing group numbers, the UN numbers. How many people have ever heard of a UN number? He wrote all that stuff down. We found it in his house.

Mr. Vieth says he has to understand that he was breaking the rules.

He doesn't. That's not what the instructions say. The instruction tells you that Mr. Evertson has to be aware of the facts that gave rise to the offense. He transported stuff down the road. Those are the facts, that there was drums full of sodium. There shouldn't be any question that he knew about those facts.

What the government does have to prove is that he willfully broke a law. Well, you can use all of that evidence in the notebooks and everything else to go back and get into Mr. Evertson's mind about what he did know and what he didn't know at the time of the offense, whether he acted willfully, with a bad intent to break the law. It shouldn't be hard because you

66

have Mr. Chaffin's testimony that tells you, "He wouldn't tell me what was in this stuff." If he was not breaking the law, why wouldn't he have told him, "Oh, yeah, it's just some sodium or whatever," if he was innocently shipping this stuff down the road.

I think you should go back and look heavily through those notebooks. But keep in mind, read the instruction carefully, it doesn't say anything about having to understand placarding or any of those other rules.

But, you know, if you want to look at the placarding rules, too, which Mr. Vieth suggested, they aren't that difficult to understand. I mean, they just say if you have hazardous materials, you have to put the UN numbers, the right packing group and that sort of thing. They are not that hard to understand, the placarding or shipping paper requirements. They are actually, if you read them here, what the government is required to prove, I submit to you, it's really pretty easy stuff, especially for somebody who can write out complex formulas like Mr. Evertson can.

They make a lot of the borax bags that were stored in the yard. They put tarps over it. That's Mr. Chaffin trying to be nice. He said, you know, "I really didn't need more than 1000 pounds.

67

Assume for purposes of argument, maybe it was 2000 pounds. He said even 2000 pounds wasn't enough. I mean, how many pounds of borax do you need to clean up some knives? Not 2000. You can rely on what you heard, your notes, but I suggest you study that carefully.

The only thing that Mr. Chaffin said was that he didn't get a phone call from him. And when he did, he doesn't remember. He vaguely remembers some phone call. And the defense's allegation is that, oh, we talked -- he didn't talk about the disposal, you know. He didn't talk about the -- if there was a problem with the rent, why didn't he bring it up then?

Well, you can use your own common sense to show that, well, maybe he didn't owe him the rent at that point. Mr. Chaffin couldn't remember when that phone call took place. I would submit it took place before the time for the rent was up.

But there is no evidence that Mr. Evertson called any of these people to check up on his stuff. There isn't one single bit of evidence in this entire case to suggest he called to check up on his stuff. He called to say, you know, you put tarps on stuff. What's the first thing that happens? It blows off. It happens all the time. Did he call him up? Did he call

68

to say, "Should I come down, fix it?" No. Nothing. There is never any communication.

Mr. Vieth says there was some communication with Mr. Espland. It took five hours. Who knows? That could be because Mr. Evertson stutters. Remember, there is a lot of discussion about that. He is a quiet guy. Maybe it took a long time to get that stuff out.

Mr. Vieth also said that on Exhibit 14, which I submit to you is the best exhibit in this whole case for the hazardous materials transportation thing because that's the one with the codes and UN numbers across the top, but he said this was copied from Ebay.

I don't remember hearing Ebay. Now, maybe you all did, but I would submit to you there isn't any evidence from anybody that material was copied from Ebay. And even if it was, it should have raised some flags for Mr. Evertson.

Let me just switch to the hazardous waste stuff real quick here, and I am going to make it really, really, really easy for you on the RCRA count.

Count 2. That's simple. The government doesn't have to show that he abandoned anything in that case. The easiest -- that's the easiest count in this whole case because if you look at Instruction 19, hazardous waste includes aqueous materials. That

## Page 69

means, you know, watery stuff that has a pH greater than or equal to 12.5.

Do you remember the above-ground storage tank? They didn't really talk about it a whole lot. They sucked a bunch of sodium hydroxide out of that stuff. It was tested at the STL labs. Remember Mr. Mattison said it tested out at pH 13.28?

MR. VIETH: Your Honor, I object. I think that misstates the instruction there, that he doesn't have to find that it's solid waste.

THE COURT: I think counsel's only referring to its reactive nature.

Is that correct?

MR. SUTCLIFFE: No. Corrosivity.

THE COURT: Corrosivity?

MR. SUTCLIFFE: It's sub C, nineteen-two.

THE COURT: Let me look. Just a moment.

MR. VIETH: I am concerned, Your Honor, that there is a concern that it doesn't have to be waste, that there is no abandonment.

THE COURT: I did not understand counsel to be so arguing.

I'm sorry, Counsel. I wanted to look and see before I...

(Pause in the proceedings.)

## Page 70

THE COURT: It's a proper definition of hazardous waste.

Now, ladies and gentlemen, you need to review all of the Court's instructions because hazardous waste does include a solid waste, which then has some of the characteristics that Mr. Sutcliffe is referring to. And then solid waste is referring to discarded material or abandoned material. I don't think Mr. Sutcliffe has argued to the contrary.

So, proceed.

MR. SUTCLIFFE: If you look at that instruction, if it has a pH greater than 12.5, in this case it's 13.28, that's .72 off the chart on the 14 side, you don't have to find that was abandoned. All you have to find is that it was discarded, that it wasn't any good anymore. That's not a product. That stuff wasn't a product. It was junk that had been generated out of this process. The minute it left the yard there at the Tanner Building, it's junk. It's going to be discarded because there has been no testimony in this entire trial that that stuff was good for anything. We can talk about the sludge and we can talk about the sodium metal in a second. But nobody got up there and told you that this stuff, this sodium in tanks that got pumped off, was good for anything.

## Page 71

It's not product. That means it's a waste.

Now, the sludge in the tank, that's also part of Count 2. If you find that it's the corrosive stuff qualified as a waste and you don't want to talk about the sludge for Count 2, don't bother. That's enough right there, the corrosive waste.

Was the other stuff reactive as a waste? They admitted the stuff is waste. It's full of sodium. You heard all the testimony. You've seen Mr. Richard Ross, experiments, explosions, and everything else.

And you don't have to find that that was abandoned either. You could find that the moment it left the yard there in Salmon, the Tanner Building, that was waste because it wasn't useful anymore. It wasn't product. You could find that. And if you want to believe it's product, you can class it like you do with the sodium metal. And that is what Count 3 is really about. Count 3 is about finding that that stuff is waste, too.

You will also see in the instructions that there is a different time frame for the sodium waste, and that's because, arguably, it was a product when it got shipped over to Steel and Ranch Supply. Once it gets shipped there, then you get to consider the issues of abandonment. That's the way that stuff becomes

## Page 72

waste. Did he abandon it? We have been all over that. Ms. Mallard argued that. I am not going to go over why those materials were abandoned.

But I just want to point out that if you don't think it's waste -- I think they have admitted that it was waste, but you can look at the manifests that the EPA sent in, Marc Callaghan's manifest. EPA did not make a rush to judgment here.

If you recall the testimony, Mr. Callaghan sat up there and said we are -- a very careful witness, kind of like annoyingly careful at times. But he said, "Yeah, I went up there." He couldn't remember if it was the first or second draft. But what difference does it make? If he decided that it was abandoned and he went up there and Mr. Chaffin signed the paper that says it's abandoned, is that a rush to judgment? I would submit it's not.

And finally, you know, just briefly, because they mentioned it, about Mr. Chaffin discussing the rent and stuff, there really isn't any evidence other than Mr. Chaffin's comments on the abandonment.

So I think if you really have any doubts about whether Mr. Chaffin wanted to use 1000 pounds of borax or 2000 or whatever, you can ask to have his testimony played back, and I would urge you to do that.

                At the end of the day here, it really isn't
that difficult if you go through these steps one by
one.  You do have to find the defendant acted willfully
as to Count 1.  That's the only thing you need to
grapple with on that case.  There is no question they
are hazardous materials.  There is no question it went
down the road.  There is no question that there were no
placards.  There is no question about that.
                The only thing you have to grapple with here
is the intent, and I would submit that there is plenty
of evidence that you can garner from the notebooks and
from other evidence that's in evidence that he knew he
was breaking the law in some respect.
                Finally, I'm just going to say, you know,
everybody, when it comes to hazardous waste, I mean,
this isn't a big mystery anymore.  Many people probably
all have sat in line out at the Fred Meyer parking lot
in Idaho Falls or down here in Pocatello someplace and
waited to take your old paint back or, you know, your
done WD40 or pesticides or whatever.
                This isn't like some mystery, you know.
Everybody is familiar with hazardous waste these days,
and we properly -- most people properly contain it.
But somebody who is in business should be held to a
higher standard than that.  He should have known that

this material had the potential to be harmful to the
environment.  You shouldn't have any problem that he
knew this material had a potential to be harmful to the
environment.
                So we would ask you to carefully examine the
instructions, read them very carefully, especially
No. 19 relating to aqueous substances and the willful
definition in the first subject.  And at the end of
that you have a verdict form, and there are three
sections here, Questions 1, 2, and 3, and we would ask
you to find him guilty on 1, 2, and 3.
                Thank you very much for your time, ladies and
gentlemen.
                THE COURT:  Thank you, Mr. Sutcliffe.

        * * * * * END OF REQUESTED EXCERPT * * * * *

R E P O R T E R ' S   C E R T I F I C A T E

    I, STACY A. HEINZ, certify that the foregoing is a
correct transcript from the record of proceedings in
the above-entitled matter.

_____        _____
    Stacy A. Heinz                 Date